IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICK KING,                        :
              **Plaintiff**        :        Civil No. 1:11-CV-1112
                                   :
              v.                   :
                                   :
**MANSFIELD UNIVERSITY OF**           :
**PENNSYLVANIA,** *et al.,*           :
                                   :        **Judge Sylvia H. Rambo**
              **Defendants**       :

## M E M O R A N D U M

In this civil action, Plaintiff, a former student and employee of
Defendant Mansfield University, alleged that Defendant Mansfield University failed
to take appropriate action regarding sexual harassment to which he was subjected by
another employee, in violation of Title VII of the Civil Rights Act of 1964 (Count I),
and that two professors failed to accommodate his depression resulting therefrom, in
violation of Title II of the Americans with Disabilities Act of 1990 (Count VI) and
Section 504 of the Rehabilitation Act of 1973 (Count VII), as well as several state
law causes of action arising under the Pennsylvania Human Relations Act (Count II)
and Pennsylvania Fair Educational Opportunities Act (Counts III, IV, and V).[1]
Presently before the court is Defendants' motion for summary judgment, in which

---

[1] Before turning to the merits of Plaintiff's claims, the court must address the putative
defendants sued under the fictitious names John Doe and Richard Roe. Plaintiff's amended complaint
asserted a Section 1983 claim against "John Doe and Richard Roe," two unidentified individuals, who
allegedly, while "acting under color of State law pertaining to the administration of police records,
intentionally and knowingly conspired together to deprive Plaintiff King of his civil rights by either
destroying all police records pertaining to his visit to the Campus Police Department or by failing to
make a proper record of that visit with the intent to protect the reputation of the University and/or John
Estep and to prevent an investigation of Plaintiff King's allegations from taking place." (Doc. 33, ¶
124.) The use of John Doe defendants is permissible in certain situations until "reasonable discovery
permits the true defendants to be identified." *See Blakeslee v. Clinton Cnty.*, 336 F. App'x 248, 250 (3d
Cir. 2009). If reasonable discovery does not unveil the proper identities, however, the John Doe
defendants must be dismissed. *Id.* Despite the lengthy period of discovery that has been conducted in
this matter, which Plaintiff unsuccessfully cites as a basis for retaining jurisdiction over his state law
claims, the true identities of these individuals have not been made known, and they have not been served
by Plaintiff. Accordingly, the court will dismiss Count VIII from the action pursuant to the Federal
Rules of Civil Procedure.

Defendants contend that Plaintiff's federal causes of action are barred by the applicable statutes of limitations and that the facts of record fail to establish the existence of a hostile work environment.  For the following reasons, Defendants' motion will be granted and the court will grant judgment in Defendants' favor on Counts I, VI, and VII and will dismiss Counts II, III, IV, and V pursuant to 28 U.S.C. § 1367(c)(3).

## I.        Background

The claims in this case are based upon the dual status of Plaintiff, Patrick King, as both a former student and former employee of Defendant Mansfield University ("Defendant Mansfield"), a state university that is part of the Pennsylvania State System of Higher Education ("PASSHE").  Plaintiff enrolled as a student at Defendant Mansfield in January 2001.  (Doc. 67, ¶ 4.)  On February 16, 2001, Plaintiff began a work-study job working for the Student Activities Director, Clarence Crisp, in which capacity he assisted in providing entertainment and activities for people on campus.  (*Id.* at ¶ 5; Doc. 65-1, pp. 136-37 of 145.)  Plaintiff was employed in this capacity at Defendant Mansfield until April 26, 2002.  (Doc. 65-2, p. 11 of 192.)  During his attendance at Defendant Mansfield, especially during the first two years, Plaintiff was involved with several student organizations, including the Mansfield Activities Council ("MAC"), a student run organization that helped facilitate entertainment events on campus.  (Doc. 67, ¶¶ 7-8.)  His duties as a member of MAC coincided with many of his responsibilities from his paid position with the Student Activities Office, including working with the Zanzibar Program, a concept that provided facilities and programs for entertainment to benefit students.  (Doc. 65-2, p. 14 of 192.)  As part of those responsibilities, Plaintiff occasionally opened and prepared a building known as the "Hut."  (*Id.* at pp. 14-15 of 192.)

2

A.    **Allegations of Sexual Harassment**

In June 2001, John Estep ("Estep"), a maintenance worker employed by Defendant Mansfield, sent Plaintiff an email inquiring into Plaintiff's sexual orientation. (Doc. 67, ¶ 13.) According to Plaintiff, the email provided as follows: "[D]ude, which way does your bat swing, because every time I'm near you I'm horny as hell." (Doc. 65-2, p. 43 of 192.) In a responsive email, Plaintiff indicated he was not interested in Estep, and requested Estep to stop any advances. (Doc. 67, ¶ 15.) Estep replied shortly thereafter, reiterating his arousal for Plaintiff, to which Plaintiff did not respond. (*Id.* at ¶ 16; Doc. 65-2, p. 46 of 192.) This was the last email Plaintiff received from Estep. (Doc. 67, ¶ 17.)

However, it was not the last unwelcome interaction Plaintiff had with Estep. At some point during June 2001, Estep requested Plaintiff's assistance at the Hut, premised upon a maintenance issue (*Id.* at ¶ 18; Doc. 65-2, p. 50 of 192), by calling Plaintiff while he was at the MAC office (Doc. 65-2, p. 53 of 192). Although the initial interaction was related to Plaintiff's responsibilities with the Hut, Estep made crude remarks, recounting an experience he had at a bathhouse during which he received oral sex and requesting to see Plaintiff's penis. (*Id.* at p. 52 of 192.) Plaintiff rebuffed Estep's request and attempted to leave the Hut, at which time Estep blocked his exit and asked Plaintiff to go into a back closet to engage in sexual activity. (*Id.* at pp. 52-53 of 192.) After again rejecting Estep's advances, Estep requested that Plaintiff not tell anybody about the foregoing interaction. (*Id.* at p. 53 of 192.) Plaintiff left the Hut alone. (*Id.*)

Shortly thereafter, Plaintiff spoke with Joseph Maresco ("Maresco"), the Vice President of Student Affairs, regarding the emails from Estep, bringing with him copies of the inappropriate communications. (Doc. 65-2, p. 60 of 192.) Maresco acknowledged Defendant Mansfield's policies forbidding the conduct

3

complained of, and informed Plaintiff that he would refer the matter to the human resources office. (*See id.*) Plaintiff never followed up on his meeting with Maresco, although Plaintiff testified during his deposition that he now knows that Defendant Mansfield had a "very elaborate procedure" for addressing allegations of sexual harassment, which he learned by looking at Defendant Mansfield's policies. (*Id.* at p. 62 of 192.)

During his deposition, Plaintiff recounted several other instances of unwelcome conduct from Estep, although he could not establish the timing of these events. Plaintiff described occasions when he was in the MAC office and Estep punched in a key code to unlock the door leading to the MAC office, despite Estep not having a reason to be there. (Doc. 65-2, pp. 62-63 of 192.) Plaintiff testified that this made him uncomfortable. Plaintiff also testified that, during the summer of 2001, he received at least two phone calls from Estep to his dorm room, during which Estep invited him to visit his house. (*Id.* at pp. 69-70 of 192.) Plaintiff also testified as follows about an interaction that occurred while he was using the bathroom in the Alumni Hall:

> Well, I'm using the toiletries [sic] and there's a knock on the stall door and I said occupied, and then I start to see John Estep crawling underneath the stall and coming in. And I screamed, shouted stop or something, then he backs off and goes away, and I finish up and I get out of there.

(Doc. 65-2, p. 71 of 192.) Plaintiff also testified about a conversation he had with Estep in Defendant Mansfield's fitness center, during which Estep commented that he had "observed males coming out of the shower facilities and [that he believed] this particular male was hot and pretty well hung." (Doc. 65-2, pp. 72-73 of 192.)

Plaintiff also testified regarding an incident that occurred at an unspecified time, during which he alleges Estep lured him to a room in the Alumni Hall. (Doc. 65-2, p. 74 of 192.)  Plaintiff described the event as follows:

> I was in the Alumni Hall Student Center.  Mr. Estep contacted me I believe in person this time.  He said they were doing something to one of the rooms, one of the offices and it might have been maybe they were repainting, I'm not sure.  So we go to - - - we go to the room, office, and when we get in there, it didn't look like they were doing anything.
>
> *   *   *
>
> While we were in the room, [Estep] walks up to me, takes his hand, and grabs, squeezes[,] and yanks my testicles.
>
> *   *   *
>
> Then I think I said stop it and then I left.

(Doc. 65-2, pp. 74-75 of 192.)  Plaintiff could not put this event in any type of temporal context aside from it occurring before Estep's resignation on May 2, 2003. (*See* Doc. 65-2, pp. 76-77 of 192; Doc. 65-7, ¶ 2.)

### B.   Disability Discrimination

Plaintiff's academic performance at Defendant Mansfield was inconsistent.  Beginning in the spring semester of 2001 through the summer semester of 2003, Plaintiff took courses at Defendant Mansfield every semester.[2]

---

[2]  During his first full semester, which spanned from January 15, 2001 through May 4, 2001, Plaintiff took seven courses for 17 credits and received grades ranging from a C to an A, resulting in a term grade point average of 2.706.  (Doc. 65-4, p. 58 of 130.)  During the first summer semester of 2001, which spanned from May 14, 2001 through June 21, 2001, Plaintiff took three courses for seven credits and received two As and a B+, resulting in a term grade point average of 3.7.  (*Id.*)  During the second summer semester of 2001, which spanned from June 25, 2001 through August 3, 2001, Plaintiff took two courses for six credits and received two As, resulting in a term grade point average of 4.0.  (*Id.*) During his Fall 2001 semester, which spanned from August 27, 2001 through December 14, 2001, Plaintiff took five courses for twelve credits and received grades ranging from an F to an A-, resulting in a term grade point average of 1.92.  (*Id.*)  During his Spring 2002 semester, which spanned from January

(continued...)

While he passed most of these courses and received at least one A or B each semester, his performance was less than stellar.  However, a review of Plaintiff's transcript demonstrates that his performance was noticeably worse during the spring and fall semesters, during which he averaged taking five courses for fourteen credits, compared to the summer semesters, during which he averaged taking two courses for six credits. (*See* Doc. 65-4, p. 58 of 130.)  Indeed, following his return to Defendant Mansfield after withdrawing in the fall of 2003 (Doc. 65-8, ¶ 2(e)), Plaintiff's petition to overload his spring semester was granted, during which Plaintiff took eight courses, three of which he failed, and received a 1.538 term grade point average (*see* Doc. 65-4, p. 58 of 130).  Plaintiff also received two B+s, a C+, and two C-s that semester. (*Id.*)

Plaintiff testified that he experienced issues with two professors of courses he took during that overloaded semester in 2004, namely Dr. Mahmoud Gaballa, who was the instructor for Business Policy, and Dr. Bruce Carpenter, who was the instructor for Money and Banking, both of whom issued to Plaintiff failing

---

(...continued)
14, 2002 through May 3, 2002, Plaintiff took five courses for fifteen credits and received three Ds, one C+, and one A-, resulting in a term grade point average of 1.8. (*Id.*)  During his first summer semester of 2002, which spanned from May 13, 2002 through June 20, 2002, Plaintiff enrolled in three courses for six credits, resulting in a term grade point average of 3.85 after withdrawing from one course and receiving one A- and one A in the courses he did complete. (*Id.*)  During his second summer semester of 2002, which spanned from June 24, 2002 through August 2, 2002, Plaintiff received a B in the one course he took for three credits, resulting in a term grade point average of 3.0. (*Id.*)  During his Fall 2002 semester, which spanned from August 26, 2002 through December 13, 2002, Plaintiff took four courses for twelve credits and received grades ranging from a D+ to a B+, resulting in a term grade point average of 2.475. (*Id.*)  During his Spring 2003 semester, which spanned from January 13, 2003 through May 2, 2003, Plaintiff took five courses for 12 credits and received one D-, two Ds, one C-, and one A, resulting in a term grade point average of 1.792. (*Id.*)  During his summer 2003 semester, which spanned from May 12, 2003 through June 19, 2003, Plaintiff took two courses for six credits and received one D and one A-, resulting in a term grade point average of 2.350. (*Id.*)  In his spring 2004 semester, which spanned from January 12, 2004 through May 8, 2004, Plaintiff took eight courses for a possible 24 credits and received three failures, two C-s, one C+, and two B+s, resulting in a term grade point average of 1.538. (*Id.*)  In the summer 2004 semester, which spanned from May 16, 2004 through June 24, 2004, Plaintiff took two courses and received a failure and a B+, resulting in three credits being awarded and a grade point average of 1.65. (*Id.*)

grades for those courses. (*See* Doc. 65-2, p. 90 of 192.)  According to Plaintiff's deposition testimony, he frequently suffered from depression during this time which caused him to miss a significant number of classes. (*Id.* at p. 83 of 192.)  Indeed, evidence of record clearly establishes that Plaintiff infrequently attended these two classes, to the extent that Dr. Carpenter testified that, of the forty classes and three exam periods for his class during that semester, Plaintiff attended only sixteen classes and one exam. (Doc. 65-5, p. 15 of 62.)  Dr. Gaballa testified that Plaintiff attended his class nine times during the entire 28-class semester. (*Id.* at pp. 32-33 of 62.)  Plaintiff inconsistently presented notes from physicians asking that his absences be excused. (*See id.* at pp. 20, 35-36 of 62.)  Both Drs. Carpenter and Gaballa testified that Plaintiff failed to make up missed work or make up exams even though they permitted Plaintiff to do so, and that they gave Plaintiff the materials he missed due to his frequent absences. (*See, e.g., Id.* at pp. 33, 37-41 of 62.)

Plaintiff failed both courses and his request for incompletes were denied.  Plaintiff subsequently petitioned Defendant Mansfield to have his grades on these two courses changed from failing to passing, alleging that the professors did not "take into account reasonable time frames to allow [him] to make up certain work." (Doc. 65-4, p. 102 of 130; *see also* Doc. 65-5, p. 10 of 62.)  In response, Defendant Mansfield held a hearing on June 9, 2004, regarding Plaintiff's request. The hearing was conducted in Plaintiff's absence,[3] during which Dr. Carpenter

---

[3]  The evidence of record belies Plaintiff's testimony that he did not receive the notice scheduling his hearing.  Following his request for a committee to hear his case on the grades he received from Drs. Carpenter and Gaballa (Doc. 65-4, p. 102 of 130), Defendant Mansfield scheduled a hearing and notified Plaintiff of the same, by way of a letter sent on June 2, 2004 to Plaintiff at the address he provided on his request and on all his subsequent petitions (*Id.* at p. 103 of 130).

explained as follows regarding Plaintiff's performance, his own conduct, and the bases for his decision to deny Plaintiff's request for an incomplete:

> The first exam [Plaintiff] missed completely. We did a make up. The second exam I saw him and I said, Patrick, are you aware we have an exam? Yes, I am [he replied]. He shows up and does the essay part in class. The multiple choice part was on the blackboard. He did not do it. The third exam he did not show up and the final exam he did not show up. . . . Altogether 24 classes missed. Now, my syllabus very clearly states that attendance is mandatory. You get three misses and then you lose three points a day off of your final —the average.

*   *   *

> Now, obviously, I didn't count the ones that are physicians excuses. . . . The section on exams, each of the exams and the final are elaborated there. [Plaintiff] got a 61 out of 100 on the first exam. That was the make up. The second exam is where he only did the essay. He got 26 out of 40 points for the essay, 26 out of 100 in total. The third exam he did absolutely nothing, and I reminded him that we had an exam coming up. . . . And the final exam he did not show up. Every chapter that we cover in this course there's a homework assignment. Part of it's a quiz on blackboard. Part of it is a written problem that they submit in class. The assignment is at least — is posted at least one week before it's due. The blackboard quiz window is open for a week. And I went through all the chapters we covered and gave a chronology of what he did and he did not do. One in particular, towards the end of the semester, we were, shall I say, scrambling and trying to get work done and I scheduled a make up quiz. I think it was — he was to come into my office — it was for chapter 11, if you look down there. He was to come into my office on April 30th to make it up. I'd given him an alternate problem. I had to give him alternate things to make up alternate exams because all the answers go to blackboard. . . . I gave him the alternate problem to do. I never got it. He did not come to my office at the appointed time. I gave the quiz to Paula, it's here — because Paula

was proctoring an exam for Dr. Gaballa the very same day. Patrick said he was not prepared to take my quiz that day and that's the last I heard from him.

In essence — well, I'm not going to speculate. As you can see, he completed precious little of the course work. He did ask me for an incomplete, by the way. It'll go on the record with it. He asked for an incomplete and I deemed it that it was not appropriate. It is my understanding that an incomplete grade is a privilege and not a right, and that one should be showing a good faith effort in the course and be near completion. It was my interpretation looking over this semester's track record that we weren't near completion and that an incomplete was just — was not justified . . . so I told him, no, I will not do incomplete.

(Doc. 65-5, pp. 15-17 of 62.)  Dr. Gaballa's testimony regarding Plaintiff's sporadic attendance and refusal to make up work was similar in nature and painted a picture of a student who did not take advantage of the accommodations made to him:

[Plaintiff] missed the final exam, and also missed submitting a major paper to be submitted in the final exam. . . . In addition, he didn't do well during the course of the semester, and I have the grades. He got a 54 out of 50 (sic) on some cases during that semester. There is another case he didn't submit. He got a 53 out of 50 (sic). The final work is 100 point[s]. He got zero because he didn't submit it. The first test he got 40 out of 100. The second test he got 64 out of 100. The final, zero, and this left him to receive the grade of F.
                               *     *     *
His attendance early in the class was very good, and then he wrote to me an e-mail, I will be out of the state February 12 to attend an IRS career fair. There is a good chance I will not be in class on that date. He wrote this on . . . Friday, 23 January[ ] 2004. Even though he wrote this - - - but he was not attending my class. He was not attending my class and he tell me on — February, the third time not be there. On another occasion he said I will be out of the state, again February 12 to attend IRS career

fair.  It is the same issue, but he was not attending the class anyway.  So I wrote to him back, best wishes at the fair.

\* \* \*

Probably he attended the class less than nine times the whole semester.

\* \* \*

. . . Then exams, he refused to take the exams with the class.  He always request[ed] additional materials to look at.  I supplement[ed] him with materials through Mrs. Welch, and he didn't do well in those exams either.

(*Id.* at pp. 30-34 of 62.)  Dr. Carpenter also testified that all of the class materials were available on the BlackBoard online classroom.  (*Id.* at p. 23 of 62.)  Dr. Gaballa similarly testified that he provided Plaintiff with all materials provided to the students, and Ms. Welch confirmed that she placed the materials in Plaintiff's hand.  (*See id.* at p. 39 of 62.)

At the conclusion of the hearing, the reviewing board made the unanimous recommendation that based on the "overwhelming evidence . . . the grades should stand as initially received as an F in Dr. Carpenter's class and an F also in Dr. Gaballa's class" on the basis of "[v]ery clear documentation that the student was deficient in attendance, performance[,] and so forth."  (*Id.* at pp. 60-61 of 62.)

In April 2004, Plaintiff met with several attorneys in Williamsport. (Doc. 65-2, pp. 118-19 of 192.)  On April 26, 2004, Plaintiff wrote letters to Governor Edward Rendell and State Representative Matthew Baker setting forth the problems he had experienced at Defendant Mansfield, which included both the actions of Estep, which he characterized as harassment and sexual assault, and the actions of Drs. Carpenter and Gaballa.  (Doc. 65-4, pp. 60-63, 65-68 of 130.)  Rep. Baker notified Plaintiff that he forwarded the letter to Dr. John Halstead, the President of the university.  (*Id.* at p. 69 of 130.)  Plaintiff wrote Dr. Halstead

directly on April 30, 2004, complaining of the actions of Drs. Carpenter and Gaballa. (*Id.* at pp. 73-74 of 130.) Estep's name or misconduct was entirely absent from the letter. (*Id.*) Dr. Halstead sent a response that scheduled a meeting for Plaintiff with Molly Bailey, the Chief Human Resources Officer and Director of Affirmative Action. (*Id.* at p. 75 of 130.) Plaintiff testified that he spoke to Bailey regarding both his issues with Drs. Gaballa and Carpenter and Estep. Around the same time, Plaintiff reported Estep's misconduct to the campus police via a written statement. (Doc. 65-2, pp. 97-98 of 192.)

### C. Administrative proceedings

On September 15, 2004, Plaintiff filed a complaint with the Pennsylvania Human Relations Commission ("PHRC"), which asserted a failure to accommodate charge but did not allege sexual harassment. (Doc. 65-4, pp. 1-5 of 130.) The complaint was dual-filed with the United States Equal Employment Opportunity Commission ("EEOC"). Plaintiff's affidavit, submitted in opposition to Defendants' motion for summary judgment, provides that, during a fact-finding conference on January 28, 2005, Plaintiff's attorney raised sexual harassment as an issue, which was included in a retaliation questionnaire signed January 31, 2005 (Doc. 76-1, ¶27; *see also id.* at p. 127 of 170), and was included in an amended complaint filed with the PHRC on May 16, 2005 (Doc. 65-4, pp. 15-24 of 130). On August 12, 2010, the PHRC issued its findings, determining that probable cause did not exist to credit the allegations of unlawful discrimination. (Doc. 65-4, p. 25 of 130.) On March 8, 2011, Plaintiff was sent notice that the EEOC adopted the PHRC's findings and provided Plaintiff with notice of his right to sue. (*Id.* at p. 26 of 130.)

## II.        Procedural History

Plaintiff initiated this action on June 9, 2011, by filing a complaint naming Defendant Mansfield as the sole defendant in this action. (Doc. 1.) Defendant Mansfield filed its answer on September 7, 2011. (Doc. 6.) With leave of court, Plaintiff filed an amended complaint, adding PASSHE and two unidentified individuals as defendants and asserting one additional count. (Doc. 33.) Four of the eight counts asserted in the amended complaint invoked federal question jurisdiction pursuant to 28 U.S.C. § 1331, on the basis that Defendant Mansfield permitted a hostile work environment due to its failure to adequately address Plaintiff's complaints regarding Estep's conduct, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (Count I), that Defendant Mansfield failed to accommodate Plaintiff's disability, in violation of both Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA") (Count VI), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("RA") (Count VII), and that the unnamed defendants conspired to deprive Plaintiff of his constitutional rights by either destroying or failing to create police records detailing Estep's unlawful conduct, in violation of 42 U.S.C. § 1983 (Count VIII).[4] Counts I, II, and III all sought redress for Plaintiff's alleged suffering sexual harassment by Estep in 2001 and 2002. Counts IV, V, VI, VII were each connected with Defendant Mansfield's alleged failure to accommodate Plaintiff's disability. Count VIII

---

[4] The remaining counts are pendent state law claims. Count II asserts a claim under Pennsylvania Human Relations Act, 43 Pa. C.S. § 951, for hostile work environment due to Plaintiff's sex. Count III asserts a claim under the Pennsylvania Fair Educational Opportunities Act ("PFEOA"), 24 P.S. §§ 5001-5010, of hostile educational environment due to Plaintiff's sex. Count IV asserts a claim under the PFEOA due to Defendant Mansfield's failure to accommodate Plaintiff's disability. Count V asserts a claim under the PFEOA of a hostile educational environment due to his disability. Due to the court's disposition of the motion for summary judgment and its decision to decline to exercise jurisdiction over the pendent state law claims, the court need not further address Plaintiff's claims under the PFEOA or PHRA.

concerned the unidentified defendants' actions related to Plaintiff's complaint filed with the campus police.

Defendants filed an answer to the amended complaint on August 2, 2013. (Doc. 44.) Following several discovery disputes and after the close of discovery, Defendants filed the instant motion for summary judgment, arguing that Plaintiff's claims under Title VII, the ADA, and the RA are each barred by the applicable statutes of limitations, and that the facts are otherwise insufficient to establish Plaintiff's hostile work environment claims. (Doc. 64.) Defendants' motion has been fully briefed and is ripe for consideration.

## III.        <u>Legal Standard</u>

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party has demonstrated an absence of material fact, the nonmoving party then must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Essentially, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court must draw all reasonable inferences in favor of the nonmovant. *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be

enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *Davis v. National R.R. Passenger Corp.*, 733 F. Supp. 2d 474, 485 (D. Del. 2010) (citing *Anderson*, 477 U.S. at 249). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the [nonmoving party], there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Id.* (citing *Revis v. Slocomb Indus.*, 814 F. Supp. 1209, 1215 (D. Del 1993)).

**IV.**      **Discussion**

The instant motion for summary judgment is presented in a layered fashion and requires the court to address several issues. With regard to Defendants' motion pertaining to Plaintiff's claim for hostile work environment, the court must first determine whether Plaintiff has established a claim for hostile work environment under Title VII sufficient to survive summary judgment. Assuming he did, the court must next address whether the claim was timely filed, which necessarily requires the court to address whether the allegations of harassment set forth in Plaintiff's May 13, 2005 PHRC charge relate back to the September 15, 2004 charge. Lastly, the court must determine whether equitable tolling is applicable. With regard to Plaintiff's ADA and RA claims, the court must first address whether Plaintiff's claims were timely filed and if not, whether equitable tolling operates to toll the statute of limitations.

**A.**      **Hostile Work Environment**

Title VII of the Civil Rights Act makes it unlawful for an employer "to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex,

or national origin. 42 U.S.C. § 2000e-2(a)(1).  Sexual harassment that creates a hostile or abusive work environment is a violation of Title VII.  *See Huston v. P & G Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citing *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999)).  In the case *sub judice*, Plaintiff alleges that he was subjected to unlawful sex-based workplace harassment.  In order to establish a prima facie case for hostile work environment on the basis of sex, Plaintiff must show evidence sufficient to demonstrate each of the following: (1) he suffered intentional discrimination because of his sex; (2) the discrimination was regular, and severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable male in the same position; and (5) a basis to impute liability to the employer exists.[5]  *Id.*

Plaintiff alleges that his coworker, not his supervisor, harassed him and created a hostile work environment.  Under such circumstances, an employer is liable for the allegedly hostile work environment only if: (1) "the employer failed to provide a reasonable avenue for complaint"' or (2) "the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action."  *Id.*  In other words, "an employer may be directly liable for non-supervisory co-worker sexual harassment only if the employer was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment."  *Id.* at 104-05.  It is undisputed that, in 2001, Plaintiff complained of Estep's conduct to Defendant Mansfield's Vice President of Student Affairs.  It is also undisputed that there were additional interactions between Estep and Plaintiff that Plaintiff found objectionable after Plaintiff complained to the vice president.

---

[5] The Third Circuit has observed that, in this context, employer liability connotes notice to the employer.  *Huston*, 568 F.3d at 104-05 n.3 (quoting *Kunin*, 175 F.3d at 293 n. 5).

"For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation omitted). In determining whether the conduct at issue is sufficiently severe, a court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993); *see also Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005).

Defendants contend that Estep's conduct, although objectionable, was not of such a nature that it established a hostile work environment under Title VII. Plaintiff urges the court to reach a different conclusion.

The objectionable conduct began in June 2001 when Estep sent Plaintiff an email inquiring into Plaintiff's sexual orientation. When Plaintiff indicated that he was not interested, Estep sent another email expressing his attraction to Plaintiff. The second email was sent within days of the first.

Later during the summer of 2001, Estep and Plaintiff went to the Hut for a maintenance-related incident. Although the initial interaction between Estep and Plaintiff appeared aboveboard, Estep began recounting an instance when he received oral sex from another male and requested to see Plaintiff's penis. When Plaintiff scorned Estep's request, Estep propositioned him. When this advancement was rejected, Estep requested Plaintiff not tell anyone about the interaction.

Also during the summer of 2001, Plaintiff received more than one phone call from Estep inviting Plaintiff to his house. Plaintiff also testified

regarding several occasions when Estep came into the Mansfield Activities Council Office while Plaintiff was there without any apparent reason.

During the summer of 2002, while Plaintiff and Estep were both in an elevator, Estep informed Plaintiff that, as a maintenance man, he had keys and security codes for doors all over campus. Plaintiff also testified regarding an incident when Estep attempted to crawl into a bathroom stall occupied by Plaintiff and recounted an instance when Estep expressed his opinion that he believed another male who he had seen in the shower was attractive. Plaintiff also testified that Estep grabbed Plaintiff's testicles while in the Alumni Hall Center sometime before May 2, 2003.

As highlighted by Defendants, these objectionable interactions took place over the course of approximately twenty months. While the court has concerns as to whether this conduct is sufficiently regular, and severe or pervasive to establish a hostile work environment, it need not definitively reach the issue because the court concludes that the record clearly establishes that the instances complained of fell outside the statute of limitations.

### 1.   <u>Statute of Limitations</u>

A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC. As an initial matter, the court considers the timeliness of Plaintiff's allegations in view of Title VII's 300 day statute of limitations. To bring a suit under Title VII, a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1); *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013). Plaintiff's charge raising sexual harassment was filed with the EEOC on May 13, 2005. (Doc. 65-4, p. 16 of

130.) Thus, the filing date would bar any claims of discrimination prior to July 17, 2004, to the extent Plaintiff's claims consisted of discrete acts.

Although Plaintiff's testimony was noticeably deficient in attempting to establish a consistent chronological order, it is clear that Plaintiff's May 13, 2005 complaint alleging sexual harassment was untimely filed. As stated, Estep retired on May 2, 2003, over a year before July 17, 2004, the outermost date of the relevant period. Accordingly, the record does not establish a single instance of objectionable conduct by Estep within the relevant period, and therefore, the charge was untimely.

### a.   Relation Back of Amendment

Defendant attempts to avoid this fatal flaw by arguing that the May 13, 2005 complaint of sexual harassment relates back to the original complaint filed on September 15, 2004. The court rejects this argument. According to the EEOC regulations:

> A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments *and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge* will relate back to the date the charge was first received.

29 C.F.R. § 1601.12(b) (emphasis supplied). Therefore, when an amendment is filed outside the applicable limitations period, it may be considered timely only if it involves claims "related to or growing out of" the original charge. 29 C.F.R. § 1626.8(c). Indeed, permitting such a late amendment to an original charge adding an entirely new theory of recovery would eviscerate the administrative charge filing requirement altogether.

In urging the court to conclude that the May 13, 2005 complaint relates back to the original complaint filed on September 15, 2004, Plaintiff focuses on the

contents of the amended complaint, citing the May 13, 2005 complaint's reference to both "[Plaintiff]'s Estep problem and [Plaintiff]'s problem with Professor Carpenter and Professor Gaballa." (Doc. 74-2, p. 18 of 30.) Plaintiff's attention is misplaced because it is the original charge that defines the parameters of amendments.

On September 15, 2004, Plaintiff filed a disability and sex discrimination claim, alleging that he was disparately treated by Professors Carpenter due to his being a male and by Professor Gaballa due to his having depression. (*See* Doc. 65-4, pp. 2-4 of 130.) The facts included in the complaint make no reference to either sexual harassment or Estep. (*See generally id.*) When Plaintiff amended his complaint on May 13, 2005, he added multiple charges that were both new and independent, including sexual harassment, and new and independent facts to support the claim. His amendments were far more substantive than merely cures to technical defects. This was an entirely new and distinct claim, which is beyond the type of amendments that relate back to the original complaint. *See, e.g., Hornsby v. Conoco Inc.*, 777 F.2d 243, 247 (5th Cir. 1985) (finding that claim of sexual harassment filed as an amendment beyond time period did not relate back to claim of age and sex discrimination); *Conroy v. Boston Edison Co.*, 758 F. Supp. 54, 58 (D. Mass. 1991) (disallowing new age discrimination claim that did not clarify or amplify original complaint). Accordingly, the court concludes that the May 13, 2005 charge does not relate back to the September 15, 2004 charge. Thus, the charge alleging sexual harassment was untimely.

### b.   **Equitable Tolling**

Plaintiff argues that equitable tolling and other equitable principles dictate that charges regarding discriminatory acts against him occurring outside the 300-day period preceding his EEOC filing are nevertheless timely. Equitable tolling

may be appropriate where: (1) the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action; (2) when the plaintiff in some extraordinary way has been prevented from asserting his rights; or (3) when the plaintiff has timely asserted his rights in the wrong forum. *See Sullivan v. Doe*, Civ. No. 07-cv-2092, 2008 WL 4083176, *7 (E.D. Pa. Aug. 28, 2008) (citing *Jones v. Morton*, 195 F.3d 153, 159 (3d Cir. 1999)); *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 (3d Cir. 1983) (citing *School Dist. of Allentown v. Marshall*, 657 F.2d 16, 20 (3d Cir. 1981)). Generally, to invoke equitable tolling, the plaintiff must show that the defendant attempted to mislead him and that the plaintiff reasonably relied on the misrepresentation by neglecting to file a timely charge. *See Jones v. Fitzgerald*, Civ. No. 14-cv-0412, 2014 WL 2938619, *1 (W.D. Pa. June 30, 2014) (citing *Hedges v. U.S.*, 404 F.3d 744, 751 (3d Cir. 2005)). Equitable tolling may apply when an employer violates the posting requirement, in which case the charging period is tolled until the plaintiff acquires actual knowledge of his rights or retains an attorney. *See Reilly v. Upper Darby Twp.*, 809 F. Supp. 2d 368, 374 (E.D. Pa. 2011) (citing *Bonham v. Dresser Indus. Inc.*, 569 F.2d 187, 193 (3d Cir. 1977)). The party seeking equitable tolling must demonstrate entitlement and establish that he acted with reasonable diligence throughout the period he seeks to toll. *See Harris v. Homecomings Fin. Servs. Inc.*, 377 F. App'x 240, 243 (3d Cir. 2010) ("In order to equitably toll a statute of limitations, a plaintiff must establish, in pertinent part, that the defendant actively misled her about her claims or that some other extraordinary circumstance prevented her from pursuing her claims. Moreover, she must demonstrate that she diligently pursued her claims." (citations omitted)).

Here, Plaintiff has not alleged any facts sufficient to infer deception, misconduct, or misleading of Plaintiff on the part of Defendant Mansfield warranting the application of equitable relief. Plaintiff simply states in his affidavit

submitted in opposition to Defendants' motion for summary judgment that neither the student handbook nor Defendant Mansfield's written non-discrimination policy and procedure satisfied the positing requirements of 42 U.S.C. § 2000e-10(a). Defendants have submitted uncontradicted evidence, in the form of a declaration executed by Molly Bailey, to establish that, during the time Plaintiff was employed by Defendant Mansfield, Defendant Mansfield posted the notices required by Title VII in conspicuous places where notices to employees and applicants for employment were customarily posted, including one such notice in the staff lounge next to the Human Resources Office in Alumni Hall. (Doc. 81-1, ¶ 3.) Accordingly, Plaintiff has failed to carry his burden and demonstrate that equitable tolling is warranted.[6]

---

[6] Plaintiff also urges the court to apply "the Latin Maxim *commondum ex injuria sua nemo habere debet* to [Plaintiff]'s hostile work environment claims." (Doc. 78, p. 24 of 35.)  Plaintiff argues that the "maxim," which he represents translates as "A wrong doer should not be enabled by law to take advantage of his actions," is at the "heart of the Third Circuits's decision in *Lake v. Arnold*, 232 F.[3d] 360, 370 ([3d] Cir. 2000)." (*Id.*)  Simply labeling something a maxim makes it no more persuasive, and the court rejects Plaintiff's request to hold Defendants liable on this basis.  In *Lake*, the Third Circuit applied the equitable tolling doctrine, but noted the unusual nature of the facts before it. *Id.* at 371.  In that matter, Elizabeth Lake, a mentally retarded woman, sued her family and physicians for having sterilized her without her consent – an action taken at the behest of her guardian. *Id.* at 371-72.  She learned of the sterilization years after the procedure after consulting a doctor about the possibility of bearing a child. *Id.*  The court found that "[p]ermitting the tolling provisions of the state statute of limitations to bar her cause of action would frustrate the federal civil rights laws by barring a remedy to a protected person because the guardian, who under state law should have sought to vindicate that person, harmed her instead." *Id.* at 372.  The Third Circuit remanded the case to the district court, instructing that "equitable tolling might be appropriate . . . where a guardian conspires to deprive a mentally incompetent person of her constitutional and civil rights." *Id.* at 370-71.  The Third Circuit further highlighted that *Lake* was unique, because the plaintiff's mental incompetence at least partially motivated the injury for which she sought recompense and because "[t]he persons, who should have protected [her] because of her retardation, instead harmed her by having her sterilized so that she could not procreate. . . .  In this instance, equitable tolling would promote Congress's intent in enacting §§ 1983 and 1985.  It would give [the plaintiff] the opportunity she was denied when she was sterilized – adequate representation of her interests – and give her a chance to seek a remedy for her injury." *Id.* at 372.  Defendant Mansfield, unlike the guardians in *Lake*, had no legal obligation to assert Plaintiff's rights for him.  Plaintiff could have sought a remedy for his injury on his own.  Accordingly, the court finds *Lake* to be *sui generis* in its application of federal tolling and inapplicable to the matter *sub judice*.

## 2.   Timeliness of Plaintiff's Title VII Claim

There was no allegation of hostile work environment in the original EEOC complaint and a claim of hostile work environment does not logically flow from a claim of disability discrimination.  Because the final instance of alleged sexual harassment occurred, at the latest, on May 2, 2003, and because the charge first containing any mention of sexual harassment was filed over two years later on May 13, 2005, the court finds the conduct that Plaintiff contends created a hostile work environment is beyond the statute of limitations and that the amended charge to the PHRC does not relate back to the date of the initial charge.  More importantly, the court finds that Plaintiff has failed to demonstrate that equitable tolling is otherwise warranted.  Accordingly, the court concludes that the undisputed facts of record clearly establish that any complaint of sexual harassment is barred by the statute of limitations and that Defendants are entitled to judgment as a matter of law on Plaintiff's Title VII claim set forth at Count I.

## B.   Title II of the ADA and Section 504 of the Rehabilitation Act

Counts VI and VII assert claims under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 on the basis of Drs. Gaballa's and Carpenter's actions with regard to accommodating Plaintiff's depression.  Title II of the ADA forbids discrimination against certain, qualified individuals with disabilities and ensures such individuals are provided reasonable accommodations so that they are not "excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity."  42 U.S.C. § 12132.  Congress believed Title II was necessary to address "pervasive discrimination 'in such critical areas as . . . housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services.'"  *Constantine v. Rectors & Visitors*

*of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005) (quoting 42 U.S.C. § 12101(a)(3)). The RA imposes nearly identical obligations on all entities that receive federal funding. *See* 29 U.S.C. § 794.

To establish a violation of either the ADA or RA, the plaintiff must demonstrate that he: (1) has a disability; (2) is otherwise qualified to participate in the program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of his disability. *Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 365 (3d Cir. 2008) (citing 42 U.S.C. § 12132). For purposes of the instant motion, Defendants have not disputed that Plaintiff has proffered evidence to establish the foregoing elements sufficient to survive summary judgment.

Rather, Defendants move for summary judgment on the basis that Plaintiff's claims under the ADA and RA are time barred. In response, Plaintiff argues that the statute of limitations was tolled during the period of time that Plaintiff's discrimination complaint was pending before the PHRC. The court concludes Plaintiff's claims are barred by the statute of limitations.

### 1. Statute of Limitations

The statute of limitations that applies to federal claims is a question of federal law. *Weis-Buy Servs. Inc. v. Paglia*, 411 F.3d 415, 422 (3d Cir. 2005). However, when a federal law provides the basis for a cause of action but does not specify a statute of limitations, an appropriate statute of limitations is borrowed from the law of the forum state. *Id.*; *accord North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995). The statute of limitations applicable to claims under Section 504 of the Rehabilitation Act and Title II of the ADA is the forum state's statute of limitations for personal injury actions. *See Disabled in Action of Pa. v. Southeastern Pa. Transp. Auth.*, 539 F.3d 199, 208 (3d Cir. 2008). In Pennsylvania, a two-year statute

of limitations applies to personal injury actions. *Id.*; 42 Pa. C. S § 5524. The general rule is that the statute of limitations begins to run as soon as a right to institute and maintain suit arises. *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 231 (3d Cir. 2003).

In this case, Plaintiff does not contend that his rights were infringed by Defendants after he requested a grade change on May 21, 2004. Nor does Plaintiff allege that he was unaware of his injury until some point after the request was denied. The undisputed evidence demonstrates that a hearing was held on his request on June 9, 2004, the results of which were unfavorable. Despite Plaintiff's claims that he never received the notice, Defendants submitted evidence that Plaintiff was notified of both the existence and outcome of the hearing. Moreover, Plaintiff never followed up with his requests for accommodation. Thus, Plaintiff's claims under the ADA and RA, initiated by his original complaint on June 9, 2011, were filed well beyond the two year limitations period applicable to these claims. Accordingly, the claims are untimely.

## 2. Tolling

Plaintiff again urges the court to toll the statute of limitations on the basis that Plaintiff had filed a PHRC claim. When a statute of limitations is borrowed from the forum state's law, the relevant state tolling rules are also incorporated. *Weis-Buy Servs.*, 411 F.3d at 422 (citing *Hardin v. Straub*, 490 U.S. 536, 539 (1989)). Pennsylvania's tolling statute permits a timely commenced civil action or proceeding that has been terminated to be commenced anew within a year of its termination. 42 Pa. C.S. § 5535(a)(1). Even assuming that Plaintiff's complaint to the PHRC constituted a "proceeding" under the statute, he cannot avail himself of statutory tolling because the PHRC proceedings were not terminated – they were adjudicated.

Plaintiff can also not avail himself of Pennsylvania's equitable tolling doctrine because Defendants did not engage in fraudulent or concealing conduct that caused Plaintiff to relax his vigilance in pursuing his claims. *See Molineux v. Reed*, 532 A.2d 792, 794 (Pa. 1987) ("Where, through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry, the defendant is estopped from invoking the bar of the statute of limitation." (internal quotation marks omitted)); *see also supra* Part IV.A.1.b.

Although the Pennsylvania statute of limitations is applied to Plaintiff's claims, "federal tolling doctrine may be applicable to determine whether . . . federal claims are timely." *Smith v. City of Phila.*, 345 F. Supp. 2d 482, 486 (E.D. Pa. 2004) (quoting *Lake*, 232 F.3d at 366) (considering the applicability of federal equitable tolling doctrine to ADA and RA claims). Plaintiff's circumstances do not warrant tolling.

Plaintiff's only argument for tolling his ADA and RA claims is that he timely filed a complaint with the PHRC. However, where a plaintiff is not required to exhaust his administrative remedies prior to bringing suit in federal court, *see Freed v. Consol. Rail Corp.*, 201 F.3d 188, 190 (3d Cir. 2000) ("[S]ection 504 plaintiffs may proceed directly to court without pursuing administrative remedies."); *Smith*, 345 F. Supp. 2d at 486-87 (holding that Title II does not require exhaustion), the statute of limitations is not tolled when the plaintiff chooses to seek those optional remedies. *See Delaware State Coll. v. Ricks*, 449 U.S. 250, 261 (1980); *Kalyanaram v. American Ass'n of Univ. Professors at N.Y. Inst. of Tech.*, 742 F.3d 42, 48 (2d Cir. 2014) ("Although equitable tolling of limitations periods has been recognized in other contexts where pursuing a separate administrative remedy is a precondition to filing suit, no such tolling is available where an optional, parallel avenue of relief is pursued." (citations omitted)); *Pramuk v. Purdue Calumet Univ.*,

Civ. No. 12-cv-0077, 2012 WL 6552920, *4-5 (N.D. Ind. Dec. 14, 2012) (holding that the statute of limitations was not tolled for the plaintiff's Title II ADA and RA claims by filing an optional complaint with the United States Department of Education Office for Civil Rights).

Here, Plaintiff initially filed a complaint with the PHRC seeking relief pursuant to the Fair Educational Opportunities Act.  While Plaintiff was not successful in his PHRC claim, it was not filed in the wrong forum, because the PHRC had jurisdiction and venue to hear Plaintiff's claim.  *Cf. Island Insteel Sys. v. Waters*, 296 F.3d 200 (3d Cir. 2002) (holding equitable tolling proper when the plaintiffs filed their claim in the wrong forum resulting in dismissal for lack of personal jurisdiction).  *But see Estrada v. Trager*, Civ. No. 01-cv-4669, 2002 WL 31053819, *6 (E.D. Pa. Sept. 10, 2002) (holding that equitable tolling was inapplicable when the plaintiff did not file a complaint in the wrong forum, but rather with the PHRC); *Calter v. Henderson*, Civ. No. 99-cv-5736, 2001 WL 1496450, *5 (E.D. Pa. Nov. 26, 2001) (holding that pursuit of relief in forum with concurrent jurisdiction does not provide exceptional grounds to toll the statute of limitations for filing a complaint with the EEOC).

Neither Section 504 RA claims nor Title II ADA claims require exhaustion.[7]  Plaintiff's pursuit of administrative remedies with PHRC was not a

---

[7] "With respect to [the plaintiff's] claims under the RA, "[S]ection 504 plaintiffs may proceed directly to court without pursuing administrative remedies." *Freed v. Consolidated Rail Corp.*, 201 F.3d 188, 194 (3d Cir. 2000); *see also Burkhart v. Widener Univ.*, 70 F. App'x 52, 53-54 (3d Cir. 2003) (non-precedential) ("[P]laintiffs need not exhaust their administrative remedies prior to bringing suit under § 504 of the [RA], which bars both federal entities and private entities receiving federal funding from discriminating on the basis of disability in any context."); *New Jersey Prot. & Advocacy v. New Jersey Dep't of Educ.*, 563 F. Supp. 2d 474, 491 (D.N.J. 2008) (same).

Similarly, exhaustion of administrative remedies is not a prerequisite to filing suit under Title II of the ADA.  *Weidow v. Scranton Sch. Dist.*, Civ. No. 3:08-cv-1978, 2009 WL 2588856, *8 (M.D. Pa. Aug. 19, 2009) ("Although Title I of the ADA requires exhaustion [of administrative remedies], Title II does not require it.") (collecting cases); *see also O'Guinn v. Lovelock Corr. Ctr.*, 502

(continued...)

prerequisite to his bringing suit in federal court. The pendency of the PHRC action did not prevent Plaintiff from initiating this action. Thus, his claims are not eligible for equitable tolling.[8]

### 3.   Timeliness of Plaintiff's ADA and RA Claims

The court concludes that, because Plaintiff filed his federal lawsuit alleging claims under the ADA and RA seven years after the final act of alleged discriminatory conduct, his claims are beyond the applicable two-year statute of limitations. Moreover, Plaintiff has failed to establish that this court should toll the applicable statute of limitations on the basis of parallel proceedings before a

---

[7] (...continued)

F.3d 1056, 1061 (9th Cir. 2007) ("We recognize that neither Title II of the ADA nor [S]ection 504 of the [RA] generally requires administrative exhaustion before filing suit." (citation omitted)); *Elwell v. Okland ex rel. Bd. of Regents of the Univ. of Okla.*, 693 F.3d 1303, 1309 (10th Cir. 2012) ("Title II of the ADA lacks the requirement that an otherwise qualified individual exhaust EEOC administrative remedies before bringing suit." (citation and internal quotation marks omitted)); *Getzes v. Mackereth*, Civ. No. 1:13-cv-2067, 2013 WL 5786000, *2 (M.D. Pa. Oct. 28, 2013).

[8]   In support of his request that the court equitably toll the statute of limitations for his ADA and RA claims, Plaintiff presents a lengthy argument relying on the Supreme Court of California's decision in *McDonald v. Antelope Valley Cmty. Coll. Dist.*, 194 P.3d 1026 (Cal. 2008), a case holding that when an employee voluntarily pursues an internal administrative remedy prior to filing a complaint under the California Fair Employment and Housing Act, the statute of limitation on her FEHA claim may be subject to equitable tolling. (*See* Doc. 78, p. 29 of 35.) Plaintiff argues that the California Supreme Court's reasoning is similar to that adopted by the Third Circuit in *Island Insteel Sys. v. Waters*, 296 F.3d 200 (3d Cir. 2002), wherein the Third Circuit stated that:

> Statutes of limitation are primarily designed to assure fairness to defendants. Such statutes promote justice by preventing surprises through revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them. Moreover, the courts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights.

*Id.* at 215-16. Here, Plaintiff slept on his ADA rights. As the Supreme Court stated in *Johnson v. Railway Express Agency*, 421 U.S. 454, 465-66 (1975), "[t]he fact that his slumber may have been induced by faith in the adequacy of his administrative remedy is of little relevance inasmuch as the two remedies are truly independent." Plaintiff has failed to demonstrate that equitable tolling is appropriate under the circumstances of this case.

administrative body with concurrent jurisdiction.  Accordingly, because Plaintiff's ADA and RA claims are time barred, Defendants' motion for summary judgment pertaining to Counts VI and VII will be granted.

### C.    State Law Claims

Defendants argues that, because Plaintiff's Title VII, ADA, and RA claims have each been dismissed, the court should decline to exercise jurisdiction over Plaintiff's PHRA and PFEOA claims.  (Doc. 66, p. 22 of 33.)  Plaintiff argues in response that the court should exercise jurisdiction because "there is no telling how long it may be until this case will be tried in a State Court."  (Doc. 78, p. 34 of 35.)  The court declines to exercise supplemental jurisdiction on Plaintiff's remaining state law claims and will dismiss Counts II, III, IV, and V.

Whether to exercise supplemental jurisdiction is within the discretion of the court.  It is well settled that a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chi. v. International Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  The Third Circuit has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (emphasis in original).

There is nothing unique about this case such that considerations of judicial economy, convenience, and fairness provide an affirmative justification for exercising supplemental jurisdiction after the court has disposed of the federal claims. Indeed, Plaintiff's argument that time and resources have been expended in this case could be said to just about any civil litigation case, and many of delays in this case have been largely at the requests of Plaintiff.

Moreover, the court notes, without deciding the issue, that certain of Plaintiff's state law claims may be similarly time barred. Undoubtedly, Plaintiff would again attempt to toll the applicable limitations period, which would require the court to again consider Pennsylvania's statute of limitations and tolling case law. This is more properly the province of a Pennsylvania state court. Accordingly, because the court will dismiss each claim over which the court has federal question jurisdiction, the court will decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and will dismiss Counts II, III, IV, and V from the action pursuant to 28 U.S.C. § 1367(c)(3).

V.      **Conclusion**

This action involves conduct that took place at least seven years prior to the filing of the original complaint and raised claims under both Title VII and the ADA and RA. The last instance of conduct by Estep occurred, at the latest, on May 2, 2003. Plaintiff first asserted the basis for his Title VII claim on January 28, 2005 during a fact finding conference, and included the claim in his amended charge filed with the PHRC on May 16, 2005, which did not relate back to his charge alleging disability and sex discrimination at the hands of his professors filed on September 15, 2004. Moreover, Plaintiff failed to sustain his burden in demonstrating that equitable tolling was warranted. Because the charge of sexual harassment was filed

with the PHRC beyond the applicable limitations period, Plaintiff's Title VII claim is untimely and the court will enter judgment in favor of Defendants on Count I.

Furthermore, the last instance of alleged disability discrimination occurred on June 9, 2004, at which time Plaintiff was denied his request to change two grades from failing to passing. Plaintiff, however, first filed his lawsuit on June 9, 2011, well beyond the two year statute of limitations applicable to the claims. Because filing a charge with the PHRC was not a jurisdictional prerequisite but rather a forum with concurrent ability to grant relief, Plaintiff's September 9, 2004 charge did not toll the applicable limitations period. Accordingly, Plaintiff's ADA and RA claims are untimely and the court will enter judgment in favor of Defendants on Counts VI and VII.

Because Plaintiff has not identified the true identities of John Doe and Richard Roe despite a lengthy period of discovery, the court will dismiss Count VIII from this action.

Lastly, because Defendants are entitled to judgment on each of Plaintiff's claims that have federal question jurisdiction and because this case does not present circumstances that warrant otherwise, the court will dismiss Counts II, III, IV, and V from the action, pursuant to 28 U.S.C. § 1367(c)(3).

An appropriate order will issue and be docketed separately.

SYLVIA H. RAMBO
United States District Judge

Dated: July 28 , 2014.

30